# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: February 6, 2018

**NO. A-1-CA-35001**

**ALFREDO MORGA, Individually and on behalf of the**
**Estate of YLAIRAM MORGA, Deceased; and as Next**
**Friend of YAHIR MORGA, Minor Child,**

**and**

**RENE VENEGAS LOPEZ, Individually and as the**
**Administrator of the Estate of MARIALY RUBY VENEGAS MORGA**
**Deceased; and GEORGINA LETICIA VENEGAS, Individually,**

Plaintiffs-Appellees,

v.

**FEDEX GROUND PACKAGE SYSTEM, INC., RUBEN'S**
**TRUCKING, LLC a/k/a RUBEN REYES a/k/a SHOOTER'S**
**EXPRESS TRUCKING, INC., the Estate of ELIZABETH SENA**
**QUINTANA, and M&K'S TRUCKING, INC.,**

Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Francis J. Mathew, District Judge**

L. Helen Bennett, P.C.
L. Helen Bennett
Albuquerque, NM

for Appellee the Estate of Ylairam Morga

Scherr & Legate, PLLC
James F. Scherr
El Paso, TX

for Appellee Alfredo Morga

Cervantes Law Firm, P.C.
K. Joseph Cervantes
Las Cruces, NM

for Appellee Yahir Morga

Daniel Anchondo
El Paso, TX

for Appellee the Estate of Marialy Ruby Venegas Morga

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward R. Ricco
Jocelyn Drennan
Jeff Croasdell
Brenda M. Saiz
Albuquerque, NM

for Appellants

**_____OPINION**

**GARCIA, Judge Pro Tem.**

{1}      This appeal is before us following a jury verdict for more than $165 million to Plaintiffs for wrongful death, personal injury, and loss of consortium claims that arose from a catastrophic automobile accident between a small pickup truck and a FedEx transport tractor-trailer. Defendants assert that the district court erred in denying their motion for a new trial or a remittitur of the damages awarded by the jury. Specifically, Defendants argue that (1) the verdict was not supported by substantial evidence; and (2) the jury's verdict was tainted by passion, prejudice, partiality, sympathy, undue influence, or a mistaken measure of damages. In addition, Defendants argue that the district court erred in awarding prejudgment interest. This case presents an opportunity to address important issues faced by the judicial system—how do appellate courts measure the outer limits of a jury's discretion to award compensatory damages and whether we should utilize mathematic ratios as an acceptable basis to reduce damage awards in large verdict cases. We decline to utilize mathematic ratios as the basis for establishing error by the district court. We affirm the district court's denial of Defendants' two post-trial motions, and accordingly, we affirm the jury's verdict. We also affirm the award of prejudgment interest.

**BACKGROUND**

{2}	On June 22, 2011, at approximately 1:30 a.m., on the interstate between Las Cruces and Deming, New Mexico, a combination tractor-trailer vehicle (the FedEx truck) struck a small pickup truck driven by Marialy Ruby Venegas Morga (Ms. Morga). Accompanying Ms. Morga was her four-year-old daughter, Ylairam Morga (Ylairam), and nineteen-month-old son, Yahir Morga (Yahir). The FedEx truck was operated by FedEx Ground Package System, Inc. (FedEx) through independent FedEx contractors, and the actual driver for the FedEx contractors was Elizabeth Quintana (Quintana) (FedEx, the FedEx contractors, and Quintana are collectively referred to as Defendants). Ms. Morga was either stopped or barely moving on the right-hand side of her traffic lane when the FedEx truck struck her vehicle from behind at sixty-five miles per hour without slowing. The impact and its resulting injuries were severe, with multiple fatalities occurring. Ms. Morga and Ylairam died, and Yahir was seriously injured. Quintana also died as a result of the accident.

{3}	Alfredo Morga, Ms. Morga's spouse, brought suit against Defendants, individually and as personal representative for his daughter, Ylairam, and as next friend for his son, Yahir. Mr. Morga also asserted claims against Defendants for personal injury and wrongful death. Ms. Morga's father, Rene Venegas Lopez, as her personal representative, brought suit against Defendants for wrongful death (Mr.

2

Morga individually and in his representative capacity for both of his children, as well as Mr. Lopez in his capacity as personal representative for Ms. Morga are referred to in this opinion as Plaintiffs). Mr. Lopez and his wife, Georgina Leticia Venegas, also intervened in the lawsuit (Intervenors) and asserted personal claims for loss of consortium resulting from the death of their daughter Ms. Morga. Prior to trial, FedEx stipulated that it would "pay for any damages attributed to [FedEx] and the other named [D]efendants."

{4}     At trial, Plaintiffs presented evidence of damages related to the wrongful death, personal injury claims by Plaintiffs and also the loss of consortium claims by Mr. Morga and Intervenors. Plaintiffs also asked the jury to award punitive damages against Defendants. The jury found all Defendants negligent and liable for Plaintiffs' claims. The jury apportioned fault for the accident as follows: FedEx (65 percent), the FedEx contractors and Quintana (10 percent each for a total of 30 percent), and Ms. Morga (5 percent). The jury awarded compensatory damages as follows:

| | |
|---|---|
| For the wrongful death of Ylairam | $61,000,000 |
| For the wrongful death of Ms. Morga | $32,000,000 |
| For personal injury and the loss of consortium for his mother, to Yahir | $32,000,000 |
| For emotional distress, resulting from physical and psychological injury, and the loss of consortium for his spouse and child, to Mr. Morga | $40,125,000 |
| For the loss of consortium of his daughter, to Mr. Lopez | $208,000 |

3

> For the loss of consortium for her daughter,
> to Ms. Venegas                              $200,000

No punitive damages were awarded by the jury.

{5}     After the verdict was entered on January 24, 2015, the district court judge presiding over the case was involved in an ex parte conversation with Plaintiffs' counsel regarding potential counsel on appeal. Recognizing that the ex parte conversation could be perceived as improper, the district court judge recused herself. The case was reassigned to Judge Mathew to preside over all the post-trial proceedings.

{6}     Defendants moved for a new trial or remittitur of the damages award and argued that the verdict was excessive. The district court denied both motions. The court concluded that there was substantial evidence to support the verdict, that it was not the result of passion, prejudice, a mistaken measure of damages, or other improper factors, and that it would be inappropriate to substitute its judgment for that of the jury. Plaintiffs then proposed a form of judgment that included an award of prejudgment interest. The district court held an evidentiary hearing on the motion and subsequently ruled that, under NMSA 1978, Section 56-8-4(B) (2004), prejudgment interest was warranted at an annual rate of 5 percent. Defendants filed a timely appeal. While the appeal was pending before this Court, Intervenors settled their loss

of consortium claims. As a result, we do not address any appellate arguments regarding Intervenors' damage awards and loss of consortium claims.

**DISCUSSION**

{7}   On appeal, Defendants do not assert any issues related to the jury's determination of liability, but only contested the jury's award of compensatory damages and the district court's award of prejudgment interest.

**I.     Denial of Defendants' Motions for New Trial or Remittitur**

**A.     Standard of Review**

{8}   We review the district court's denial of Defendants' motions for a new trial or remittitur for an abuse of discretion. *See State v. Mann*, 2002-NMSC-001, ¶ 17, 131 N.M. 459, 39 P.3d 124 ("[The appellate courts] will not overturn a trial court's denial of a motion for a new trial unless the trial court abused its discretion."); *Hanberry v. Fitzgerald*, 1963-NMSC-100, ¶ 2, 72 N.M. 383, 384 P.2d 256 (applying an abuse of discretion standard for the review of an appellant's "claim that the verdict [was] excessive, requiring a remittitur or a new trial"); *Sandoval v. Baker Hughes Oilfield Operations, Inc.* (*Jose Sandoval*), 2009-NMCA-095, ¶ 13, 146 N.M. 853, 215 P.3d 791 ("The applicable standard in reviewing the denial of a motion for a new trial or remittitur is [an] abuse of discretion."). "[The] trial court abuses its discretion when its decision is contrary to logic and reason." *N.M. Right to Choose/NARAL v.*

*Johnson*, 1999-NMSC-028, ¶ 6, 127 N.M. 654, 986 P.2d 450 (internal quotation marks and citation omitted); *see Talbott v. Roswell Hosp. Corp.*, 2008-NMCA-114, ¶¶ 29-30, 144 N.M. 753, 192 P.3d 267 (recognizing that a trial court does not abuse its discretion in denying a motion for a new trial unless its decision was "arbitrary, capricious, or beyond reason" (internal quotation marks and citation omitted)). However, even when we review for an abuse of discretion, our review of the application of the law to the facts is conducted de novo. *Id.* ¶ 9.

{9}     Our appellate courts defer to the jury in awarding damages and also to the trial court in its assessment of a motion for new trial or a motion to remit the amount of damages awarded by the jury. *See Ennis v. Kmart Corp.*, 2001-NMCA-068, ¶ 27, 131 N.M. 32, 33 P.3d 32 ("When a trial court denies a motion for a remittitur, we defer to the trial court's judgment. When the jury makes a determination and the trial court approves, the amount awarded in dollars stands in the strongest position known in the law." (internal quotation marks and citations omitted)); *see also Coates v. Wal-Mart Stores, Inc.*, 1999-NMSC-013, ¶ 49, 127 N.M. 47, 976 P.2d 999 (recognizing the appellate court's reliance on the trial court because of its unique position "to observe the witnesses and their demeanor as well as the jurors' attitude during the trial" whereas we review the record cold); *Salopek v. Friedman*, 2013-NMCA-087, ¶ 30, 308 P.3d 139 ("In determining whether a jury verdict is excessive, we do not reweigh

the evidence but determine whether the verdict is excessive as a matter of law. The jury's verdict is presumed to be correct." (internal quotation marks and citation omitted)).

{10} Defendants argue that such deference to the district court should not be afforded in this particular case because Judge Mathew did not have the opportunity to observe the proceedings first hand. Defendants therefore contend that a de novo standard of review should apply. Defendants cite no authority to support their contention that a judge duly appointed to proceed with an ongoing case, pursuant to Rule 1-063 NMRA,[1] is not entitled to the same discretion given to other trial judges presiding over a case. We decline to deviate from this established precedent—recognizing an abuse of discretion standard of review—for four reasons. First, this Court will not consider propositions that are unsupported by citation to authority. *See ITT Educ. Servs., Inc. v. N.M. Taxation & Revenue Dep't*, 1998-NMCA-078, ¶ 10, 125 N.M. 244, 959 P.2d 969. Second, although this standard of review argument was presented as one based on inherent logic, this Court is bound by Supreme Court precedent, including the appropriate standard of review to be

---

[1]Stating that "[i]f a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties."

applied. *See State ex rel. Martinez v. City of Las Vegas*, 2004-NMSC-009, ¶¶ 20-22, 135 N.M. 375, 89 P.3d 47 (stating that although the Court of Appeals is bound by Supreme Court precedent, we may explain "any reservations [this Court] might harbor over its application of [Supreme Court] precedent so that we will be in a more informed position to decide whether to reassess prior case law"). We can only note the potential logic of Defendants' argument regarding applying a different standard of review in the present case, but any change to the standard of review must be implemented by our Supreme Court. Third, although Judge Mathew was not in the "unique position to observe the witnesses and their demeanor as well as the jurors' attitude during the trial[,]" *Coates*, 1999-NMSC-013, ¶ 49, he does have "experience with juries in the community," which this Court stated is "an indispensable safeguard built into our American civil jury system." *Sandoval v. Chrysler Corp.* (*James Sandoval*), 1998-NMCA-085, ¶ 14, 125 N.M. 292, 960 P.2d 834. Fourth, Defendants made no objection below regarding Judge Mathew's capacity or ability to fully preside over the hearing for remittitur or a new trial.

{11}     In reviewing the actual evidence presented at trial, "we review the sufficiency of the evidence to support the verdict by examining whether the verdict is supported by such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Jose Sandoval*, 2009-NMCA-095, ¶ 12 (internal quotation marks and

citation omitted). "We review all evidence in the light most favorable to the verdict and resolve all conflicts in the light most favorable to the prevailing party." *Id.* (internal quotation marks and citation omitted).

**B.      Analysis of the Evidence to Support the Jury's Award**

{12}      "The purpose of compensatory damages is to make the injured party whole by compensating it for losses." *Cent. Sec. & Alarm Co. v. Mehler*, 1996-NMCA-060, ¶ 11, 121 N.M. 840, 918 P.2d 1340. "A jury's damages award will be upheld unless it appears that the amount awarded is so grossly out of proportion to the injury received as to shock the conscience." *Salopek*, 2013-NMCA-087, ¶ 31 (internal quotation marks and citation omitted). This Court is required to consider two factors in making the determination of whether a jury award is excessive. First, we consider "whether the evidence, viewed in the light most favorable to the plaintiff, substantially supports the award." *Wachocki v. Bernalillo Cnty. Sheriff's Dep't.*, 2010-NMCA-021, ¶ 48, 147 N.M. 720, 228 P.3d 504 (alterations, internal quotation marks, and citation omitted), *aff'd*, 2011-NMSC-039, 150 N.M. 650, 265 P.3d 701. If any portion of the award is supported by substantial evidence, we must next consider "whether there is an indication of passion, prejudice, partiality, sympathy, undue influence or a mistaken measure of damages on the part of the fact[-]finder." *Id.* If the award does not satisfy either of these tests, then all or some portion of the

award is deemed excessive. *See Jose Sandoval*, 2009-NMCA-095, ¶ 16. In the present case, Defendants argue that the evidence did not support the award of damages and that passion, prejudice, or sympathy affected the jury's determination of the amount of damages it awarded. However, even if the jury's award is higher than the court would have given, this is not sufficient to disturb a verdict. *Id.* ¶ 17. An award of damages will be disturbed only in extreme circumstances. *See Salopek*, 2013-NMCA-087, ¶ 30. "The proper approach is to examine the plaintiff's evidence related to damages and determine whether that evidence could justify the amount of the verdict, or determine whether the verdict amount was grossly out of proportion to the evidence of the plaintiff's [injury]." *Id.* ¶ 31 (alterations, internal quotation marks, and citation omitted).

{13}     Although Defendants concede that the evidence at trial supported an award for compensatory damages, they argue that the amounts awarded to Plaintiffs were excessive for two reasons.[2] First, Defendants argue that the awards for wrongful death, bodily injury, and loss of consortium "far exceed any previous awards in this state" and the evidence was insufficient to support such an excessive award. Second, Defendants argue that because the awards for the economic injury make up such a

---

[2] This concession only applied to the damages claimed by, or on behalf of, Alfredo, Yahir, Ylairam and Marialy Morga. The concession did not apply to the settled loss of consortium claims by Rene and Georgina Venegas.

10

small portion of the total award (between 1 and 3 percent), the damage awards are "grossly disproportionate to the injury" and constitute legal error requiring a new trial on the issue of damages. We recognize that Defendants' arguments are both primarily directed at whether the amount of the jury's award for non-economic damages "is so grossly out of proportion to the injury received as to shock the conscience" of this Court. *Id.* (internal quotation marks and citation omitted).

**1. Substantial Evidence Was Presented to Support the Award of Economic and Non-Economic Damages to Plaintiffs**

{14} In the present case, Defendants do not dispute that the jury was properly instructed regarding its duty to review the evidence and calculate Plaintiffs' damages. The jury was instructed as follows:

> The guide for you to follow in determining fair and just damages is the enlightened conscience of impartial jurors acting under the sanctity of your oath to compensate the beneficiaries with fairness to all parties to this action. Your verdict must be based on evidence, not on speculation, guess or conjecture. You must not permit the amount of damages to be influenced by sympathy or prejudice, or by the grief or sorrow of the family, or the loss of the deceased's society to the family.

They were further instructed to consider neither the property or wealth of the beneficiaries nor that of Defendants in arriving at a verdict. We summarize the compensatory damages evidence related to each Plaintiff separately.

11

**a.     Alfredo Morga**

{15}     The jury awarded Mr. Morga $40.125 million for compensatory damages. The jury was instructed that if they should decide in favor of Mr. Morga, they must "fix the amount of money which will reasonably and fairly compensate him" for injuries related to the following elements of damages: past and future medical expenses; the "nature, extent[,] and duration of the injury[;]" pain and suffering experienced as a result of the injury; loss of enjoyment of life; aggravation of a pre-existing ailment or condition; and emotional distress resulting from the death of his wife, Marialy, his daughter, Ylairam, and the injuries to his son Yahir.

{16}     The evidence established that, prior to the accident, Mr. Morga suffered from epilepsy which was controlled by medication. Mr. Morga's epilepsy intensified after the accident and became more frequent. Additionally, expert testimony established that Mr. Morga suffered from posttraumatic stress disorder, major depressive disorder, and that he would need at least a year of intensive psychotherapy and psychiatric care. Dr. Angelo Romagosa, a medical doctor specializing in physical medicine and rehabilitation, testified that Mr. Morga would need $250,068 in physician care, medications, and rehabilitation services in the future due to the injuries suffered as a result of the accident.

{17} With regard to the emotional distress of Mr. Morga due to the loss of society and companionship for the injuries and death of his family members, the jury heard substantial evidence about this close young family and the irreparable personal loss that resulted from the accident. Mr. Morga testified about meeting Ms. Morga as a freshman in high school. The Morgas began dating and had their daughter, Ylairam, during their senior year. Mr. Morga testified about the details of their early lives—high school, his work at various part-time jobs to support the family—as well as Ms. Morga's background in high school, youthful activities, and eventually taking care of the home and their new baby, Ylairam. In October 2009 they had their second child, Yahir. Mr. Morga also provided numerous details about their daily lives, close relationship, buying a home, advancements at work, and plans for the future after Yahir was born. Mr. Morga then testified to his recollection of when he went to the scene on the night of the accident. He was told not to approach the vehicle where his wife and daughter were still located. He then went to the hospital in El Paso, Texas, where his son was taken following the accident and where he stayed for several days. Mr. Morga testified that he was unable to return to work for months after the accident. Mr. Morga also described how the accident severely affected him emotionally.

### b.     Yahir Morga

{18}     The jury compensated Yahir $32 million for past and future damages for injuries he suffered as a result of the accident. The jury was instructed that should they decide in favor of Yahir, they must "fix the amount of money which will reasonably and fairly compensate [him]" for injuries related to the following elements of damages: past and future medical expenses; the "nature, extent[,] and duration of the injury"; pain and suffering experienced; loss of enjoyment of life; and emotional distress resulting from the death of his mother, Ms. Morga.

{19}     At trial, the evidence showed that Yahir suffered a distal tibial metaphyseal fracture, traumatic brain injury, a liver laceration, a right pulmonary contusion, and other traumatic injuries. Yahir incurred $58,444.68 in medical treatment. Dr. Romagosa testified that Yahir would need $417,926.47 in future medical care. Additionally, Dr. King testified that Yahir would be at an "increased risk for psychological difficulties down the road due to the early loss of his mother and sister." After the accident, Yahir regressed in his use of speech and had to see a psychologist. Additionally, Mr. Morga testified that Yahir would wake up at night afraid and crying. Ms. Morga's older sister, Rebecca Brown, also testified regarding the relationship between Yahir and his mother prior to the accident.

## c.     Ylairam Morga

{20}     The jury compensated the Estate of Ylairam $61 million for her wrongful death. The jury was instructed that if it were to find for the Plaintiffs, it "must then fix the amount of money which you deem fair and just for the life of Ylairam," for the following elements of damages: "reasonable expenses of funeral and burial[;] lost earning capacity, and the lost value of household services; [t]he value of her lost life; and the mitigating or aggravating circumstances attending the wrongful act, neglect, or default."

{21}     Ylairam was only four years old at the time of the accident. At trial, Plaintiffs presented evidence regarding several aspects of Ylairam's life and her relationship with her family for the jury to consider in determining the amount of damages to be awarded for her death, including testimony by her father, Mr. Morga and various family photographs.

## d.     Marialy Morga

{22}     The jury awarded the Estate of Ms. Morga $32 million for her wrongful death. The jury was instructed that it "must . . . fix the amount of money which you deem fair and just for [her] life," including the following the elements of damages: "[t]he reasonable expenses for the funeral and burial; [t]he lost earning capacity and the [lost] value of household services; [t]he value of [her] life apart from her earning

15

capacity; aggravating or mitigating circumstances attending the wrongful act, neglect or default; [and t]he loss of guidance and counseling to the deceased's minor child."

{23} At trial, specific evidence was presented regarding Ms. Morga's life so that the jury could make its determination of the damages incurred as a result of Ms. Morga's death. Ms. Brown testified about Ms. Morga's early life, her family and home in El Paso, Texas, as well as her personality and interests. Ms. Brown also testified regarding the closeness of their relationship. She presented Ms. Morga as a good mother, as well as an attentive daughter and wife. Mr. Morga also testified about his relationship with his wife, buying their first home, raising their two children, and their plans to put their children through college. He also testified that Ms. Morga had been planning to get her graduate equivalency degree, and someday obtain her cosmetology degree.

**e. The Evidence Supports the Jury Award**

{24} Defendants' arguments regarding the sufficiency of the evidence are, at their core, solely objections to the jury's large awards for non-economic injuries to Plaintiffs. Defendants did not target any specific component of Plaintiffs' evidence as insufficient or erroneous. Defendants do not dispute that the non-economic injuries and damages incurred by Plaintiffs are unique, intangible, and difficult to quantify in financial terms. As such, our judicial system relies on juries and trial courts, as the

16

representatives of their local community, to best evaluate and determine the monetary value of these non-economic injuries, including pain and suffering, and the loss of life. *See James Sandoval*,1998-NMCA-085, ¶¶ 13-14 ("The amount of awards necessarily rests with the good sense and deliberate judgment of the tribunal assigned by law to ascertain what is just compensation, and, in the final analysis, each case must be decided on its own facts and circumstances. . . . In addition, the trial judge's experience with juries in the community provides an indispensable safeguard built into our American civil jury system." (internal quotation marks and citation omitted)).

{25}     In this case, Defendants made a strategic decision to entrust the jury with the decision of how to determine the value of a life from the evidence presented, even going so far as to exclude Plaintiffs' economist from providing testimony regarding "specific damages for the value of a statistical life[,]" including "any numbers offering a benchmark value as to human life." Defendants' counsel specifically told the jury, " I am not going to submit to you a number, because I agree the value of life—I don't want to insult anybody about the value of life in this case. But you have to rely on you[r] own conscious[] when you're looking at [the] value of life." We agree that the damage awards in this case were very large. However, when an experienced district court judge, who is familiar with juries in his community, properly reviews the record and evaluates a motion for new trial and a motion for

17

remittitur; the fact that Plaintiffs' awards are large does not transform Plaintiffs' undisputed evidence into something illogical or insufficient. Furthermore, although Defendants were afforded an opportunity to present evidence or testimony at trial to guide the jury in their determination of the value of life and other non-economic damages, Defendants specifically chose not to do so. Under our discretionary standard of review, Plaintiffs presented sufficient evidence to support the jury's right to perform its unique function—award all compensatory damages, including any non-economic damages for pain and suffering and loss of life that were incurred by Plaintiffs. Proper instructions were given that describe the factors a jury must consider in making its compensatory damage awards. We can only interpret Defendants' appellate argument to effectively require the appellate courts to establish a threshold or an absolute financial limit on the value of life, despite the district court and the jury's best efforts to fulfill their assigned duty to quantify something that is legally unique, intangible, and difficult to measure. We refuse to implement such a legal threshold or limit. Based upon the evidence presented at trial and the arguments presented for post-trial review, the district court did not abuse its discretion in denying Defendants' motions for a new trial or remittitur on the grounds of insufficient evidence to support the damage awards for Plaintiffs' non-economic injuries.

**2.  Comparison to Similar Verdicts in Other Cases Will Not be Applied to Develop Defendants' Sufficiency of the Evidence Argument**

{26}  Defendants' argument centers on the awards for wrongful death, pain and suffering, and emotional distress damages, all of which are non-economic and cannot be determined by any fixed standard. *See Baca v. Baca*, 1970-NMCA-090, ¶ 28, 81 N.M. 734, 472 P.2d 997 ("There is no fixed standard for measuring the value of a life, and, as in personal injury cases, wide latitude is allowed for the exercise of the judgment of the jury in fixing the amount of such an award."). Instead, a jury is given wide latitude in fixing the amount of such awards. *See id.*; *see also James Sandoval*, 1998-NMCA-085, ¶ 13 (recognizing that "there can be no standard fixed by law for measuring the value of pain and suffering" (omission, internal quotation marks, and citation omitted)).

{27}  Defendants ask this Court to compare the amount of damages awarded in this case to other similar cases and cite to our Supreme Court's analysis in *Vivian v. Atchison, Topeka & Santa Fe Railway Co.*, to support their argument that such comparisons are "helpful" to determine whether a verdict is excessive. 1961-NMSC-093, ¶ 11, 69 N.M. 6, 363 P.2d 620 (emphasizing "that each case must be determined upon its own facts and circumstances[,] nevertheless, . . . a consideration of other verdicts and a comparison of the facts and circumstances is helpful"). We do not consider *Vivian* helpful toward providing guidance in the

19

present case. First, it is very difficult for this Court to apply the analysis in *Vivian* to the facts in this case. *Vivian* involved a workplace injury where, after a review of the evidence, our Supreme Court ultimately determined that "[i]t would serve no useful purpose to review other verdicts" in order to grant the plaintiff the option between remittitur and a new trial limited solely to the issue of damages. *Id.* ¶¶ 1-2, 25-26. Second, Defendants have failed to cite to any authority where a court conducted an actual comparison of other verdicts in order to grant a new trial or remit the jury's damage award to a lesser amount. Third, Defendants conceded at oral argument that they failed to identify in the record and did not otherwise provide the district court or this Court with any evidence of comparable jury awards that would support their argument for conducting a comparative analysis with those cases alleged to be "similar." Defendants' counsel specifically stated that they were only "obligat[ed] to come forward with an argument and a basis to argue that the verdict is excessive under common community standards, and if the court is looking for numbers, [the courts bear the obligation to] look to the court's own case law and see . . . the wrongful death damages and verdicts that have been reported [over the last ten years.]" Fourth and finally, Defendants do not dispute or attack any of Plaintiffs' evidence regarding both economic and non-economic damages.

{28} Instead, this Court has continued to emphasize that "each case must be decided on its own facts and circumstances." *James Sandoval*, 1998-NMCA-085, ¶ 13 (internal quotation marks and citation omitted). We have also questioned the usefulness of comparing non-economic damage awards in one case with the awards in other cases. *See Jose Sandoval*, 2009-NMCA-095, ¶ 18 (noting that "[w]e are skeptical about the usefulness of comparing awards for pain and suffering in other cases"); *Robinson v. Mem'l Gen. Hosp.*, 1982-NMCA-167, ¶ 20, 99 N.M. 60, 653 P.2d 891 (stating that the defendant's request that the court compare the verdict awarded to other cases was improper because "the question of excessive damages must be determined from the evidence in [each] case"); *Sweitzer v. Sanchez*, 1969-NMCA-055, ¶ 5, 80 N.M. 408, 456 P.2d 882 (stating that what this Court may have done in other cases was of "no consequence [because] the question of prejudice and . . . the measure of damages must be determined from the evidence in [each] case" (internal quotation marks, and citation omitted)). We recognize that our Supreme Court has upheld a district court's discretion in granting a substantial remittitur to a jury's damages verdict, for a claim of emotional distress, when no economic damages were offered into evidence. *See Nava v. City of Santa Fe*, 2004-NMSC-039, ¶¶ 16-20, 136 N.M. 647, 103 P.3d 571 (holding that the remittitur of the amount awarded to a plaintiff for emotional distress was upheld on a comparative basis where very specific

21

factual findings were issued by the district court, there was a lower amount requested by the plaintiff at trial, and due to the lack of any evidence of physical harm). However, this case is very distinguishable from *Nava*, both factually and procedurally. In the present case, undisputed economic damages were presented and awarded to Plaintiffs, and this Court is now being asked to reverse, not affirm, the remittitur decision issued by the district court—a completely opposite analysis.

{29}     Defendants simply argue that the damage awards for wrongful death are "tens of millions of dollars greater than any awards in similar cases and far exceed any previous award in this [S]tate for wrongful death or comparable loss" and "far outstrips any prior verdict." Yet Defendants concede that they did not bring any evidence of other non-economic damage award cases to the attention of the district court for comparison. Even if a comparative verdicts analysis would be helpful to this Court in assessing excessive damages, Defendants have elected not to offer such an analysis or to make any connection to the evidence in this case. This Court is under no obligation to go outside the record to investigate and develop Defendant's argument about greatly exceeding all prior damage awards in this State. *See Santa Fe Expl. Co. v. Oil Conservation Comm'n*, 1992-NMSC-044, ¶ 11, 114 N.M. 103, 835 P.2d 819 (stating that where a party fails to cite any portion of the record to support its factual allegations, the appellate courts need not consider its argument on appeal);

*Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701 ("This Court has no duty to review an argument that is not adequately developed."); *see also* Rule 12-318(A)(3) NMRA (requiring briefs in chief to contain "a summary of proceedings, briefly describing the nature of the case, the course of proceedings, and the disposition in the court below, and including a summary of the facts relevant to the issues presented for review[, which] summary *shall contain citations to the record proper, transcript of proceedings, or exhibits supporting each factual representation*" (emphasis added)). Defendants have neither identified any of Plaintiffs' evidence deemed insufficient to support the jury's award of non-economic damages nor suggested the type of additional evidence that is necessary to support such an award. As a result, this Court will not undertake Defendants' offer to search the entire record and then search the existing universe of severe injury cases in an attempt to compare the substantive evidence and damage awards in other cases with Plaintiffs' substantive evidence and damage awards in the present case. *See Kepler v. Slade*, 1995-NMSC-035, ¶ 13, 119 N.M. 802, 896 P.2d 482 ("Matters outside the record present no issue for review." (internal quotation marks and citation omitted)).

**3.    A Comparison of Non-Economic to Economic Damages is Unsupported by our Case Law**

{30}    Next, Defendants argue that because the economic damages proven at trial make up a "minuscule part" of the total amount of damages awarded, the total

23

amounts awarded to Plaintiffs are grossly disproportionate to the measurable injuries that occurred. We begin by recognizing that this Court has specifically rejected any fixed, mathematical formula as the best way to arrive at a damage award for pain and suffering—one aspect of non-economic damages—because "there can be no standard fixed by law for measuring the value of pain and suffering." *James Sandoval*, 1998-NMCA-085, ¶ 13 (omission, internal quotation marks, and citation omitted). Instead, we have concluded time and again that, although it may be frustrating to assess non-economic damages without "a fixed, mathematical formula[,] . . . the best way to arrive at a reasonable award of damages is for the trial judge and the jury to work together, each diligently performing its respective duty to arrive at a decision that is as fair as humanly possible under the facts and circumstances of a given case." *Id.* ¶ 16.

{31}     We leave any continuing concerns about the use of mathematical formulas to establish a legal basis for addressing excessive jury verdicts to the public and its ongoing debate with the legislative branch about the American judicial system and any major policy changes in New Mexico. *See id.* ¶ 17 (recognizing the public criticism and ongoing debate regarding excessive jury verdicts). Even in *James Sandoval* where "[t]he [trial] judge acknowledged that the jury verdict shocked the conscience of the court" we remanded for further consideration rather than undertake

24

our own calculation of damages. *Id.* ¶¶ 7, 12-18. At this time, we see no support for Defendants' argument that the appellate courts should use fixed mathematical formulas to establish legal error and as the proper basis for reversing a jury's non-economic damage award.

**B.      The Verdict is Not the Result of Jury's Passion or Prejudice**

{32}     Defendants argue that we may simply "infer" that the jury was improperly influenced by passion or prejudice from the verdict itself and that it is "not necessary to point to trial error as a cause." However, we disagree that our case law allows us to infer improper passion or prejudice simply because the verdict is large and therefore "speaks for itself as to the existence of passion or prejudice." In *Vivian*, our Supreme Court stated that a verdict was "so grossly excessive as to require an inference that it resulted from passion, prejudice, partiality, [and] sympathy[.]" 1961-NMSC-093, ¶ 14. However, our Supreme Court made this statement only after having undertaken a "careful review of the evidence of pain, suffering, loss of earnings, and physical injuries" and holding that there was "no substantial evidence to support [the] verdict[.]" *Id.* Defendants have failed to present any type of evidentiary review for this Court to analyze in the present case, and we shall not undertake such a review or consider such an argument that is not developed on appeal. *See Santa Fe Expl. Co.*, 1992-NMSC-044, ¶ 11 (stating that where a party

25

fails to cite any portion of the record to support its factual allegations, the appellate courts need not consider its argument on appeal); *Corona*, 2014-NMCA-071, ¶ 28 ("This Court has no duty to review and argument that is not adequately developed.").

{33} We also disagree with Defendants' argument that because the jury awarded sums "far greater" than requested by Plaintiffs, we may legally infer that passion and prejudice played an improper role in the jury's determination of damages. This argument mischaracterizes Plaintiffs' statements during closing argument as a request for a specific amount of monetary damages. Counsel for Ms. Morga's estate proposed to the jury that when considering damages for the loss of Ms. Morga's life, it could consider placing a value on a person's individual days of life. Counsel hypothetically stated, "[i]sn't it worth $500 a day for the enjoyment of your life, for the enjoyment of life that [Ms. Morga] has been deprived of? When you value life, I ask you to give those considerations of her life expectancy as an appropriate way for you to try and measure and place a value on something that we recognize . . . can't be valued." We perceive this hypothetical suggestion to be general guidance to the jury for developing its own method for arriving at a valuation for Ms. Morga's life. The fact that the jury chose its own method or a higher daily value for the enjoyment of life when it awarded damages different from the hypothetical example suggested by

counsel, does not establish error by the jury. We reject such a hypothetical inference that the jury's damage awards were the result of passion and prejudice.

{34}    We now turn to the specific incidences occurring during trial that Defendants argue provoked passion or prejudice in the jury. These incidences include Mr. Morga's trial testimony and what Defendants characterize as "misconduct by Plaintiffs' counsel" in closing argument.

**1.    Mr. Morga's Testimony**

{35}    Defendants argue that Mr. Morga's testimony was "emotionally wrenching" when it addressed the sequence of events involving when he was informed of the accident, arrived at the scene, and observed the vehicle. Defendants concede that Mr. Morga's testimony was "an unavoidable aspect of the trial" but insist that the testimony "easily could have moved the jury" to award excess damages based on improper passion or prejudice.

{36}    Mr. Morga's testimony was not objected to by Defendants. Counsel elicited testimony from Mr. Morga concerning his wife and children, as well as his description of the week leading up to the accident. Mr. Morga became visibly upset when asked how he learned about the accident and the district court ordered a recess break for the jury. Plaintiffs' counsel was then allowed to use leading questions on direct examination regarding when Mr. Morga arrived at the scene of the accident.

When Mr. Morga again began crying, the district court took a second recess, and it ordered counsel to move on to another subject. Defendants' counsel commented, "[i]t's not necessary to make [Mr. Morga] cry to the jury, I'm sorry." Although the district court expressed concern with Mr. Morga's health and the impact of the testimony, there is no indication in the record that the district court believed improper prejudice had occurred from his testimony. Mr. Morga returned to the stand and completed the direct and cross-examination without any further breaks.

{37}     Throughout Mr. Morga's testimony, Defendants did not ask the district court to strike any of his testimony, and Defendants never requested any kind of limiting instruction or admonition to the jury. Prior to deliberations, the jury was properly instructed that sympathy was not to play a role in the jury's determination. Without more than a witness crying during testimony that both parties expect to be visibly emotional, we cannot presume that the jury violated its oath and failed to follow the jury instructions. *See Norwest Bank N.M., N.A. v. Chrysler Corp.*, 1999-NMCA-070, ¶ 40, 127 N.M. 397, 981 P.2d 1215 (stating that the appellate courts "assume the jury followed such instructions absent evidence to the contrary"). Mr. Morga's testimony was understandably emotional, but there is no indication in the record that the testimony incited improper passion or prejudice within the jury. *See State v. Finnell*, 1984-NMSC-064, ¶ 23, 101 N.M. 732, 688 P.2d 769 (noting that the introduction of

28

evidence that allegedly caused a witness to become very emotional and cry during her testimony was neither prejudicial nor sufficient to arouse the passion of the jury and require a mistrial); *State v. Garnenez*, 2015-NMCA-022, ¶¶ 25-26, 344 P.3d 1054 (holding that a pause in trial and the removal of a member of the courtroom gallery who became emotional and cried during upsetting testimony did not mandate a mistrial be declared or prevent the jury from rendering a fair and impartial verdict).

**2.      Closing Argument**

{38}     Next, Defendants argue that Plaintiffs' closing argument caused the jury to be infected by improper passion or prejudice. Defendants point to three incidences in Plaintiffs' closing argument: (1) a photograph admitted into evidence, but previously unused by any witness at trial, depicting the crushed vehicle in which Ms. Morga's body was partially visible; (2) what Defendants characterize as Plaintiffs arguing to the jury that FedEx was attempting to "shift responsibility for the accident to its contractors"; and (3) Plaintiffs' "justice needs to be ignited" comment related to punitive damages. Defendants argue that the above incidents during closing arguments, individually or in combination, provide the legal basis for establishing improper passion or prejudice by the jury and causing an "excessive award of damages."

{39} We begin our review by emphasizing that a defendant must make "a timely and specific objection[, one] that apprised the district court of the nature of the claimed error and that allows the district court to make an intelligent ruling thereon" in order to preserve an issue for appeal. *Jose Sandoval*, 2009-NMCA-095, ¶ 56; *see* Rule 12-321(A) NMRA (requiring that "it must appear that a ruling or decision by the trial court was fairly invoked" in order to preserve a question for review). The purpose of the preservation rule is "to specifically alert the district court to a claim of error so that any mistake can be corrected at that time, . . . to allow the opposing party a fair opportunity to respond to the claim of error and to show why the court should rule against that claim, and . . . to create a record sufficient to allow this Court to make an informed decision regarding the contested issue." *Jose Sandoval*, 2009-NMCA-095, ¶ 56. Defendants now ask us to distinguish the analysis we employed in *Jose Sandoval*.

{40} In *Jose Sandoval*, this Court declined to consider alleged instances of misconduct by the plaintiff that were argued to be the cause of improper passion or prejudice because the defendant did not make a proper objection at trial. *Id.* ¶¶ 60-72. However, this Court noted that

> [i]n cases involving improper closing argument, as when counsel go outside the record[,] we reserve the right in a proper case to reverse the judgment and award a new trial even if objection be not made. However, this rule is to only be applied as a last resort and is not to be applied

30

> unless we are satisfied that the argument presented to the jury was so *flagrant and glaring in fault and wrongdoing as to leave the bounds of ethical conduct*, such as going outside the record.

*Id.* ¶ 57 (emphasis added) (internal quotation marks and citations omitted). Defendants argue that the specific instances it has cited satisfy this *Jose Sandoval* exception because they are "so flagrant and glaring in fault . . . as to leave the bounds of ethical conduct[.]" Defendants also argue that our *Jose Sandoval* decision represents an outlier in our case law that should not be perpetuated. These arguments are not compelling. A formal Court of Appeals opinion is controlling authority. *See Gulbransen v. Progressive Halcyon Ins. Co.*, 2010-NMCA-082, ¶ 13, 148 N.M. 585, 241 P.3d 183. Our reasoning in *Jose Sandoval* is in line with the well-established rule on preservation. 2009-NMCA-095, ¶ 57 (noting that "other than in Florida, no other courts in this country allow improper argument to be raised for the first time on appeal in civil cases, but noting that in *Griego v. Conwell*, 1950-NMSC-047, ¶ 17, 54 N.M. 287, 222 P.2d 606 our] Supreme Court warned that it would [reserve the right to] do so, but it has never carried out its threat" (internal quotation marks and citations omitted)); *see* Rule 12-321(A) (requiring that "it must appear that a ruling or decision by the trial court was fairly invoked" in order to preserve a question for review); *see also Berkstresser v. Voight*, 1958-NMSC-017, ¶ 10, 63 N.M. 470, 321

31

P.2d 1115 (per curiam) (stating that our Supreme Court has "held numerous times that to preserve a question for review[,] a litigant must invoke a ruling thereon").

{41} Finally, we disagree with Defendants that the alleged incidents of misconduct by Plaintiffs, either individually or collectively, are "so flagrant and glaring in fault and wrongdoing as to leave the bounds of ethical conduct" or rise to the level of flagrant or fundamental error. *Jose Sandoval*, 2009-NMCA-095, ¶ 57; *see Estate of Gutierrez ex rel. Jaramillo v. Meteor Monument, L.L.C.*, 2012-NMSC-004, ¶¶ 32-33, 274 P.3d 97 ("The fundamental error doctrine is codified in Rule [12-321(B)(2)]. . . . This rule shall not preclude the appellate court from considering in its discretion, questions involving . . . fundamental error. . . . [T]his Court has applied the doctrine in civil cases under the most extraordinary and limited circumstances."(alterations, internal quotation marks, and citation omitted)). Despite Defendants' failure to preserve an objection to these particular closing arguments by Plaintiffs, we shall also discuss the merits of each allegation of misconduct and explain why we conclude that no legal err was established by Defendant.

**a. The Photograph**

{42} The district court ruled that the photograph of the crash site could be used at trial if a "yellow sticky" note was placed to cover what appeared to be a human arm in the photo. The "yellow sticky" note purportedly fell off before closing argument.

32

However, Defendants made no objection to the error and counsel for Defendants acknowledged that he chose not to object to this error during the closing argument. After Plaintiffs rested and the jury was excused for a recess break, Defendants' counsel mentioned the absence of the "yellow sticky" note. The district court acknowledged the missing note covering the designated portion of the photo and assured the parties that the photo would not go to the jury during deliberations as a solution to the issue now being brought to the court's attention. No further objection was made to this decision by the district court to address the "yellow sticky" note issue.

{43}     Defendants argue that Plaintiffs' use of the photograph is an example of "flagrantly improper conduct" that could not be cured by an instruction from the district court. However, Defendants have failed to show that Plaintiffs' use of the photograph was so glaring in fault as to leave the "bounds of ethical conduct" or that the district court's ruling to address the issue rose to the level of fundamental error. *See Grammar v. Kohlhaas Tank & Equip. Co.*, 1979-NMCA-149, ¶ 38, 93 N.M. 685, 604 P.2d 823. There is no indication in the record that: (1) Plaintiffs' use of the photograph without the "yellow sticky" note was intentional; (2) any comment was made to the jury by Plaintiffs' counsel regarding the portion of the photograph that was intended to be covered and excluded by the "yellow sticky" note; or (3) the

photograph was so gruesome and inflammatory that, without the "yellow sticky" note, it inflicted flagrant and incurable prejudice upon the jury. *See Allen v. Tong*, 2003-NMCA-056, ¶¶ 35, 39, 133 N.M. 594, 66 P.3d 963 (holding that counsel's statement in closing argument, "if the jury found [the d]efendant was not negligent, then that will be the end of this trial and your job will be over, and you will get back to your jobs and families[,]" was not "a flagrant or glaring wrongdoing that requires [this Court] to invoke fundamental error" (internal quotation marks omitted)). Furthermore, the district court addressed the issue on the record and recognized that any potential harm appeared very minor at that point, stating "I seriously doubt [the jury] recognized that as an arm. If you hadn't told me it was an arm when we first discussed it, I don't think I would've known that." Despite Defendants' assertion at oral argument that this highly prejudicial photograph is part of the record on appeal, it was not provided as part of the record for our independent review. As a result, we have no independent basis to question the district court's analysis and resolution of the issue at trial. *See Williams v. Mann*, 2017-NMCa-012, ¶ 19, 388 P.3d 295 ("Upon a doubtful or deficient record, every presumption is indulged in favor of the correctness and regularity of the trial court's decision, and the appellate court will indulge in reasonable presumptions in support of the order entered." (internal quotation marks and citation omitted)). Without any further indication of unethical

34

conduct or fundamental error, the use of this photograph will not be recognized as causing the jury to render an improper verdict based on passion or prejudice.

**b.      Comments Related to Allocation of Fault**

{44}      Defendants argue that Plaintiffs' counsel made improper comments in closing argument related to FedEx's fault and responsibility for the damages incurred by Plaintiffs. First, Defendants argue that Plaintiffs' counsel tried to shift responsibility for the accident to its contractors, even though FedEx had agreed to pay for any damages attributed to its contractors or Quintana. Second, Defendants contend that Plaintiffs' comment—"it's happened before"—regarding other FedEx accidents defied Defendants' motion in limine to exclude all reference to other accidents involving Defendants. However, after reviewing the complete record of Plaintiffs' closing argument, we interpret Plaintiffs' comment differently. Comparative fault was a specific issue at trial and the parties disagreed about how the jury should allocate fault between the various Defendants. Plaintiffs argued that FedEx was attempting to allocate fault to their contractors and had used similar arguments in the past. Although FedEx assumed liability for all Defendants in this matter, the jury was still required to apportion fault amongst each Defendant. Defendants did not object to the jury verdict form that listed all four Defendants separately, as well as Ms. Morga, for the allocation of comparative liability. Because Defendants did not object to

35

Plaintiffs' comments in closing or the jury instructions, we must apply a fundamental error standard of review. *See Allen,* 2003-NMCA-056, ¶¶ 33-34 (noting that a failure to properly object to issues regarding the instructions tendered to the jury will only be reversed on a basis of fundamental error). Defendants have again failed to convince this Court that Plaintiffs' comments were so glaring in fault as to leave the "bounds of ethical conduct" or that the error rose to the level of fundamental error. *Grammar*, 1979-NMCA-149, ¶ 38. Where the allocation of comparative fault was a proper function to be decided by the jury, Plaintiffs' comments would not be unethical or otherwise create any inference that the jury rendered an improper verdict.

**c.      Plaintiffs' Closing Argument Regarding the Need to Ignite Justice**

{45}      Defendants objected to one fragment of Plaintiffs' closing argument in particular, the statement that "they don't want to show the pictures to inflame the [j]ury. Well, sometimes justice needs to be ignited." Defendants argue that this type of comment encouraged the jury to follow their passion and misled the jury by implying that Defendants sought to suppress photographic evidence. Again, when read in the full context of closing argument, Plaintiffs' statements were not outside the scope of proper argument, especially where Plaintiffs asked the jury to punish Defendants for their conduct and punitive damages were an issue the jury was properly required to decide. In addition, the jury was properly instructed that all

arguments made by counsel in closing were not "to be considered by you as evidence or as correct statements of the law, if contrary to the law given to you in [the jury] instructions." We conclude that if Defendants believed that Plaintiffs' closing arguments were clearly illegal, unethical, or going outside the record, they should have timely and specifically objected at trial, requested an appropriate curative instruction or admonishment, and given the district court the opportunity to correct any error. *See Jose Sandoval*, 2009-NMCA-095, ¶ 58 ("We believe that if defense counsel had timely and specifically objected and had requested and received an appropriate curative instruction and/or admonition, the issue would not now be in this Court."); *Grammar*, 1979-NMCA-149, ¶ 34 ("The objection to alleged improper argument must be specified and made known to the [trial] court so that the court may intelligently rule thereon. When that is not done, the proposition is not properly reviewable on appeal."). Without giving the district court an opportunity to evaluate Plaintiffs' "justice needs to be ignited," closing argument in the context of a potential award of punitive damages, we neither view such an argument as being so glaring in fault as to leave the "bounds of ethical conduct" nor do we recognize it to rise to the level of fundamental error. *See Grammar*, 1979-NMCA-149, ¶ 38 (stating that this Court will only consider the narrow exception to the preservation requirement as a

"last resort" and only if the plaintiff's lawyer goes outside the actual record in a flagrant and glaring manner so as to "leave the bounds of ethical conduct").

**C.     The Jury's Award Was Not the Result of a Mistaken Measure of Damages**

{46}     Finally, Defendants argue again that we may infer from the size of the jury's verdict that it applied a mistaken measure of damages. *See Hanberry*, 1963-NMSC-100, ¶ 32 (stating that after a careful review of the evidence, the award was so extremely excessive "that it is not truly supported by the evidence and therefore must indicate that the jury was mistaken in the measure of damages"). Defendants assert that "the jury mistakenly applied a punitive measure of damages in awarding compensatory damages." We disagree that such an appellate inference can be drawn exclusively from the size of a damages verdict or the evidence presented for an award of punitive damages. We emphasize that Defendants have the burden, as the appellants, to demonstrate from the record that the jury was mistaken in its award. *See Coates*, 1999-NMSC-013, ¶ 51 (stating that in appealing a denial of a remittitur, the appellant "bears the burden of showing that the record supports its contention that there was error in the verdict" or "that the verdict (i.e., damage awards) was infected with passion, prejudice, partiality, sympathy, undue influence, or some corrupt cause or motive" (internal quotation marks and citation omitted)).

{47} Plaintiffs asked the jury to award 2 percent of FedEx's $7 billion net worth as punitive damages in this case. Defendants argue that although the jury awarded no punitive damages, the amount in compensatory damages awarded—$165 plus million—is close to what was requested for punitive damages—$140 million. In the review of the special verdict form submitted to the jury, Judge Mathew specifically noted, "[t]he special verdict form indicates clearly that the jury understood that they were returning a verdict for compensatory damages." Furthermore, there are indications from the poll conducted of the jury following the actual verdict that several jurors wanted to give additional punitive damages, in addition to the amount awarded for compensatory damages. Defendants even stated on the record, "probably a couple of them wanted [to give] punitives" and the trial court agreed with Defendants' observation of the issue and comment. Based upon this clear record, Defendants' argument that the jury mistakenly applied a punitive measure of damages to award compensatory damages is not supported. *See id.* ¶ 52 (recognizing that the defendants had not "borne [their] burden of proving error"); *Baxter v. Gannaway*, 1991-NMCA-120, ¶ 18, 113 N.M. 45, 822 P.2d 1128 (recognizing that when "a jury makes an award which covers each element of damages," it is not our place to "say as a matter of law the jury verdict is founded upon a mistaken measure of damages").

## II.    Prejudgment Interest

{48}    The district court had the discretion to award prejudgment interest. Section 56-8-4(B); *Coates*, 1999-NMSC-013, ¶ 55 ("The trial court has the discretion to award prejudgment interest."); *Smith v. McKee*, 1993-NMSC-046, ¶ 7, 116 N.M. 34, 859 P.2d 1061 (stating that when the trial court's decision to award prejudgment interest is discretionary, any award shall be reviewed for an abuse of discretion and reversed only where its decision "is contrary to logic and reason"). Section 56-8-4(B) allows the trial court, in its discretion, to award interest of up to 10 percent after considering, among other factors, the following:

> (1) if [Plaintiffs were] the cause of unreasonable delay in the adjudication of [Plaintiffs'] claims; and

> (2) if [Defendants] had previously made a reasonable and timely offer of settlement to [Plaintiffs].

"Prejudgment interest serves two purposes, promoting early settlements and compensating persons[.]" *Coates*, 1999-NMSC-013, ¶ 55. "Interest is awarded to make the tort victim whole, and has no bearing on the question of punishing the tortfeasor[.]" *Id.*

{49}    On March 31, 2015, the district court held its hearing on the issue of prejudgment interest and specifically limited the evidentiary presentation to factors within the elements of Section 56-8-4(B). Plaintiffs presented evidence of the

40

possibility for a significant damage award resulting from the death and injury to Plaintiffs and that Defendants made one offer for settlement during the only mediation prior to trial. Defendants offered no witnesses at the hearing but relied upon the evidence that was attached to their motion to deny prejudgment interest. Defendants' motion argued that because Plaintiffs refused to accept a provision for confidentiality as part of any settlement agreement, "there was no point to trying to negotiate a potentially mutually acceptable settlement amount." Based upon the evidence presented, the district court concluded that there was "no evidence of delay in this case by any party" but that "Defendants did not make reasonable or timely offers of settlement." The district court's order further concluded that "the refusal on the part of . . . Plaintiff[s'] counsel to engage in settlement discussions which involved any form of confidentiality agreement was not reasonable." The district court then balanced Plaintiffs' refusal to settle on a confidential basis with what it termed as Defendants' "complete lack of appreciation or concern about the potential result of a trial," to conclude that prejudgment interest was warranted in the amount of 5 percent per annum—half the allowable rate under the statute. *See* § 56-8-4(B) (giving the district court the discretion to allow interest up to 10 percent from the date of the complaint).

{50} Defendants now assert that their "liability was not a foregone conclusion" and that "the facts were not clear-cut in Plaintiffs' favor." Defendants also argue that the trial court abused its discretion in granting prejudgment interest by ignoring "[d]ifficult legal issues" and "thorny issues of causation, comparative fault, and [damages]." *Sunnyland Farms, Inc. v. Cent. N.M. Elec. Co-op., Inc.*, 2013-NMSC-017, ¶ 62, 301 P.3d 387. We disagree. Defendants' argument that its right to dispute liability and the complexity of the case precluded its obligation to make a reasonable and timely settlement offer is not a proper reading of the statute. Although the complexity of a case may preclude reaching a settlement, Section 56-8-4(B) requires Defendants to make a reasonable and timely offer of settlement in order to avoid an award of prejudgment interest, irrespective of complexity. Furthermore, at the hearing to address prejudgment interest, Defendants conceded that they recognized the potential for a large verdict in favor of Plaintiffs.

{51} Finally, Defendants argue that Plaintiffs' refusal to make a settlement offer that included a provision for confidentiality was unreasonable and the district court's acknowledgment of Plaintiffs' unreasonableness should control the issue of prejudgment interest. In fact, Defendants argue that it was pointless for Defendants to make a reasonable settlement offer despite the district court's additional ruling that Defendants showed a "complete lack of appreciation or concern about the potential

42

results of a trial." We disagree and emphasize that the statute does not require the parties to actually reach a settlement, it only requires that Defendants make a reasonable settlement offer. *See* § 56-8-4(B). If no reasonable settlement offer was made by Defendants, other settlement conditions imposed by Plaintiffs are just one of many discretionary matters for the district judge to consider. *Id.* The district court's discretion in awarding prejudgment interest allowed the court to evaluate both parties' actions that caused any failure by Defendants to make a reasonable settlement offer and then allocate an appropriate level of prejudgment interest accordingly. Here, the district court's conclusion that Defendants' sole settlement offer was unreasonable and their "complete lack of appreciation or concern about the potential results of a trial" is a logical conclusion that is supported by the record. Selecting an intermediate level of prejudgment interest—5 percent—is also a reasonable and logical accommodation under the circumstances where Plaintiffs refused to accept confidentiality as a settlement condition. As a result, the district court did not abuse its discretion by awarding 5 percent prejudgment interest under the circumstances presented in this case.

**CONCLUSION**

{52}     For the foregoing reasons, we affirm the district court's denial of Defendants' motions for a new trial or remittitur. We also affirm the district court's grant of prejudgment interest.

{53}     **IT IS SO ORDERED.**

_____

**TIMOTHY L. GARCIA, Judge Pro Tem**

**WE CONCUR:**

_____

**MICHAEL E. VIGIL, Judge**

_____

**M. MONICA ZAMORA, Judge**